# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NELDA FLEENOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CIV-10-064-D |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Nelda Fleenor ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for supplemental security income payments under the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Upon review of the pleadings, the record ("Tr."), and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

## Administrative Proceedings

Plaintiff initiated these proceedings by filing her application seeking supplemental security income payments in March, 2008 [Tr. 84 - 86]. She alleged that mental problems, hepatitis, seizures, and hypoglycemia became disabling as of March 3, 2003 [Tr. 107]. Plaintiff's claims were denied and, at her request, an Administrative Law Judge ("ALJ") conducted a June, 2009 hearing where Plaintiff, who was represented by a non-attorney

professional Social Security representative [Tr. 49], and a vocational expert testified [Tr. 21 - 40]. In his August, 2009 decision, the ALJ found that Plaintiff retained the capacity to perform available work and, accordingly, was not disabled within the meaning of the Social Security Act [Tr. 9 - 20]. The Appeals Council of the Social Security Administration declined Plaintiff's request for review [Tr. 1 - 4], and Plaintiff subsequently sought review of the Commissioner's final decision in this court.

**Standard of Review**

This court is limited in its review of the Commissioner's final decision to a determination of whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations and quotations omitted). Nonetheless, while this court can neither reweigh the evidence nor substitute its own judgment for that of the Commissioner, the court's review is not superficial. "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §416.920(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). Under this sequential procedure, Plaintiff bears the initial burden of proving that she has one or more severe impairments. 20 C.F.R. § 416.912; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Then, if Plaintiff makes a prima facie showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner*, 754 F.2d at 328; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).

**Plaintiff's Claim of Error**

Plaintiff's sole claim is that "[t]he ALJ committed reversible legal error by failing to properly evaluate the opinions of [Plaintiff's] treating physician, Dr. Ahn."[1] [Doc. No. 19, p. 14].[2]

---

[1] Dr. Ahn – the treating psychiatrist whose opinions are the only focus of this appeal – treated Plaintiff for her mental difficulties. Plaintiff has not challenged the ALJ's conclusions with respect to her alleged physical limitations and, accordingly, that evidence will not be addressed.

[2] Unless otherwise indicated, quotations in this report are reproduced verbatim.

**Analysis**

The ALJ determined that Plaintiff – who was forty-seven years old when she applied for benefits and who had at least a high school education[3] and no past relevant work [Tr. 19] – was severely impaired by a history of schizophrenia, hepatitis C, sciatic neuritis by history, alcohol and drug abuse by history, and psychotic disorder [Tr. 11]. In finding that Plaintiff's mental impairments were severe but did not meet the criteria of a listed impairment, the ALJ concluded that Plaintiff was mildly restricted in her activities of daily living [Tr. 12]. She dressed herself, required no assistance with personal hygiene, prepared simple meals, did housework and laundry, mowed the lawn, and shopped in the local grocery store. She lived with her disabled mother and assisted with her care; she helped check her mother's blood sugar and assisted her with insulin injections. *Id.*

The ALJ determined that Plaintiff had moderate difficulties with social functioning, preferring to stay at home and avoid other people. *Id.* Nonetheless, she was able to maintain meaningful relationships with her mother and siblings, to shop at her local grocery store, to attend her counseling and medical appointments, and to attend self-help meetings including Alcoholics Anonymous and Narcotics Anonymous. The ALJ concluded that "[e]ach of these activities requires social interaction." *Id.* Likewise, the ALJ found that Plaintiff suffered from moderate difficulties with concentration, persistence, or pace, specifically noting that she may have difficulty concentrating at times. *Id.* She was, however, able to attend

---

[3]Plaintiff testified at her administrative hearing that she had also completed a year and a half of college [Tr. 24].

meetings on time, to use food stamps, to pay bills, count change, handle a savings account, and use a checkbook, all of which are "activities [that] require a threshold level of concentration." *Id.*[4]

Despite her impairments, the ALJ ultimately concluded that Plaintiff maintained the residual functional capacity ("RFC")[5] to perform unskilled[6] light work so long as she could perform that work in relative isolation with limited contact with peers, supervisors, and the general public [Tr. 13]. The ALJ's decision reflects his consideration of the following evidence and factors in arriving at that assessment.

With respect to the objective medical evidence, many of the medical records in this case were generated during a three year period in which Plaintiff was in the custody of the Oklahoma Department of Corrections [Tr. 164 - 336]. The ALJ addressed these records in the following manner:

> During her incarceration through March of 2008, the claimant received institutional care, which included medication management. During counseling sessions, the claimant reported that she got along well with others in her unit; but, sometimes isolated herself to manage her anxiety. Upon her medications, she advised that her auditory hallucinations stopped during the daytime. On multiple occasions, the claimant advised of her future plans to live with and take care of her disabled mother in Watonga, Oklahoma. At the time of her release on March 18, 2008, the claimant reported mild symptoms of anxiety and no acute symptoms of schizophrenia (Exhibits 2F and 5F).

---

[4]Plaintiff does not challenge the ALJ's step three assessment.

[5]Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 416.945(a)(1).

[6]The ALJ specifically concluded that Plaintiff could sustain the concentration necessary to perform unskilled work [Tr. 13].

[Tr. 14]. As the ALJ noted, Plaintiff subsequently presented at the St. Anthony emergency room on March 24, 2008, stating that she had run out of her medications and requesting refills [Tr. 14 and 342]. On examination, Plaintiff was reported as anxious with a flat affect, but appeared stable with her thoughts intact and with no finding of hallucinations. [Tr. 14, 342, and 347].

At St. Anthony's, Plaintiff was referred for follow-up care with a psychiatrist, Maria M. Kane, beginning on April 7, 2008 [Tr. 14, 347, and 497]. The ALJ's decision sets out the following summary of Dr. Kane's treatment notes:

> Dr. Kane prescribed different regimens of psychotropic medications with variable results. Dr. Kane continued the claimant on Dilantin for her seizure disorder, noting upon the medication that she was stable and seizure free. The claimant reported progressive and continued improvement on her medications. On July 10, 2008, she reported she had been busy with daily chores and continued to take care of her mother who was diabetic and had severe glaucoma, noting she was unable to see except for form. The claimant also requested a statement from Dr. Kane to release her from her student loan which Dr. Kane declined. On September 9, 2008, the claimant related her brother who lived next door was going on vacation for a week and that she would be alone with her mother. On February 24, 2009, the claimant requested that Dr. Kane write a letter of dire need to her congressman to help expedite her disability application. Dr. Kane declined to do so, explaining "it was unfair to the other patients who are also trying to get benefits just like her without the help of some politician." Dr. Kane related the claimant was not happy about that (Exhibit 24F).

[Tr. 14]. In this regard, the ALJ noted that "claimant promptly switched her medication management to her new provider, Christopher Kolker, M.D., with initial examination on February 26, 2009. Dr. Kolker examined the claimant four times through April 9, 2009, and

6

has continued prescribing her palliative medications. His records are silent concerning any emergent complaints or symptoms (Exhibit 22F)." *Id.*

Of particular importance to Plaintiff's claim of error in this appeal is the ALJ's discussion of Plaintiff's treatment by Dr. Ahn:

> Following her incarceration, the claimant also established outpatient mental health services at Red Rock Behavioral Health Services in Watonga, Oklahoma, with intake on April 2, 2008. The claimant was provided individual counseling with improvement. At times, the claimant reported various activities helped keep her busy by gardening, mowing the yard, cleaning the house, journaling, listening to music, doing word searches, and caring for her disabled mother. At one point, the claimant reported that she had to care for her niece's three children all under the age of four, in addition to caring for her mother. At repeated appointments, the claimant was observed as having appropriate behavior, interaction, and physical appearance with normal range mood and affect and normal speech. In July of 2008, the claimant indicated she was willing to come to the medication clinic with Dr. Ahn since her doctor in Oklahoma City would not listen to her about her medications. On at least two occasions, the claimant filled her medication, Remeron, and received samples for two different dosages of Seroquel, from the Red Rock medication clinic. The clinic records reflect the claimant received the same on August 27, 2008; and, September 24, 2008 (Exhibit 18F). Of interest, the claimant also received medications from Dr. Kane, her psychiatrist in Oklahoma City, during the same time period. On August 7, 2008; and again on September 9, 2008, Dr. Kane gave the claimant a thirty day supply of her Seroquel, along with her other medications, including Xanax. Dr. Kane continued the claimant's medications on October 8, 2008; November 5, 2008; and, December 3, 2008 (Exhibit 24F). It does not appear that the claimant advised either psychiatrist of the duplication and overlap of her medications. This certainly darkens the claimant's credibility.[7]

[Tr. 14 - 15].

---

[7]Plaintiff has not challenged the ALJ's credibility assessment on appeal [Doc. No. 19].

The final pertinent objective evidence considered by the ALJ was the report of the consultative, examining psychologist:

> On June 3, 2008, the claimant underwent psychological evaluation with the consultative psychologist, Robert Danaher, Ph.D. The claimant was driven by her sister to the appointment and arrived on time for the same. The claimant was dressed casually with appropriate hygiene. She was alert and oriented with logical, intelligible, and goal directed speech. The claimant related at the age of twelve, she was given LSD and that she has flashbacks from that. She described problems with confusion, memory loss, nightmares, mood swings, and anxiety. The claimant advised of auditory hallucinations and stated the voices told her to hurt herself and to hurt others. Dr. Danaher found the claimant's description was stereotypical and not consistent with what individuals who actually experience the auditory hallucinations usually report. As such, Dr. Danaher found the claimant's description of hearing voices was not viewed as credible (Exhibit 9F).
>
> Several of the claimant's responses in questioning were not credible. The claimant did not know the specific date and suggested the wrong year. Dr. Danaher found the claimant's remote memory functioning was intact in that she could relate the events of her life in a coherent and consistent manner. He found her immediate memory functioning was poor and that the nature of her errors was unusual. The claimant was able to name only two recent presidents. The claimant was able to recall one of three objects after a five minute lapse in time with intervening tasks; when provided with memory prompts directed towards assisting her recall, she continued in her apparent inability to remember those things she had been asked to commit to memory. The claimant was unable to name five large cities in the United States. She did not know the direction that the sun rises in or the temperature that water freezes at. The claimant advised she was not able to count backwards from 100 subtracting by 3's, and did not attempt to follow the instructions. Likewise, she indicated she was unable to solve problems involving money and did not attempt the same. In simple arithmetic, Dr. Danaher found the claimant made numerous unusual errors. The claimant responded that she did not know the answers when asked to explain common proverbs and to give similarities and differences. Dr. Danaher found the replies perhaps related a low level of motivation (Exhibit 9F).
>
> Dr. Danaher specified:

> This individual's presentation and her symptom description as well as her response to formal mental status examination items was very unusual. Due to the nature of the unusual symptom description and rare responses to formal mental status examination items this examiner wondered about the possibility of malingering. The patient was administered the Miller Forensic Assessment of Symptoms Test (M-FAST) for the purpose of clarifying this matter (Exhibit 9F).
>
> Upon the objective M-FAST screening, the claimant scored twenty, which Dr. Danaher found was extremely elevated and suggested a strong possibility the claimant was malingering. He noted the cutoff score was six for suspected malingering. Dr. Danaher explained this type of a response would be observed in one who was probably exaggerating the frequency and severity of mental health related symptoms. Dr. Danaher ultimately found it was difficult to evaluate the claimant's ability to understand, remember, and carry out simple and complex instructions due to the fact she did not appear to be providing her best effort (Exhibit 9F).

[Tr. 15 - 16]. Based upon Dr. Danaher's findings as well as other evidence outlined in the decision, the ALJ concluded that Plaintiff was not suffering from mental health symptoms to the degree she alleged [Tr. 17]; this determination has not been challenged on judicial review [Doc. No. 19].

With respect to the opinion evidence of record, the ALJ determined that the conclusions of the State agency expert consultant – Plaintiff can understand, remember, and carry out simple tasks with routine supervision, can adapt to a work environment, can relate to supervisors and peers on a routine basis, but cannot relate to the general public [Tr. 392] – should be given "substantial weight as consistent with the overall evidence [and] have been incorporated into the determination of the claimant's residual functional capacity." [Tr. 18].

9

Plaintiff's single claim of error on judicial review is that such RFC is impermissibly at odds with the Mental Medical Source Statement signed by Dr. Ahn in June, 2009 [Tr. 509 - 512]. There, Dr. Ahn opined that Plaintiff would have no limitation[8] in her ability to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to travel in unfamiliar places or use public transportation; and, to set realistic goals or make plans independently of others [Tr. 510 - 511].

Dr. Ahn further concluded that Plaintiff would have no significant limitation[9] in her ability to understand and remember very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and, to be aware of normal hazards and take appropriate precautions [Tr. 509 - 511].

Moderate limitations[10] were assessed by Dr. Ahn in Plaintiff's ability to remember locations and work-like procedures; to understand and remember detailed instructions; to

---

[8]The form signed by Dr. Ahn defines "[n]o limitation" as "[n]o affect on ability to perform basic work functions." [Tr. 509].

[9]"No significant limitation" is defined as "[o]nly minimal affect on ability to perform basic work functions." [Tr. 509].

[10]A "[m]oderate limitation . . . [a]ffects but does not preclude ability to perform basic work functions." [Tr. 509].

carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to make simple work related decisions; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes [Tr. 509 - 510].

Dr. Ahn also opined that Plaintiff suffered from marked limitations[11] in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods and, finally, from a severe limitation[12] in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods [Tr. 510].

Under the law of the Tenth Circuit, "[a]ccording to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart,* 373 F.3d 1116, 1119 (10th Cir. 2004). A sequential analysis must be undertaken by an ALJ when considering a treating source medical opinion which relates to the nature and severity of a claimant's impairments. *Watkins v. Barnhart,* 350 F.3d 1297, 1300 (10th Cir. 2003). The first step, pursuant to Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2, is to determine whether the opinion is well-supported by medically acceptable techniques.

---

[11]A "marked limitation" is described as "seriously affect[ing] ability to perform basic work functions." [Tr. 509].

[12]Dr. Ahn's form defines a "severe limitation" as an "[e]xtreme affect on ability to perform basic work functions." [Tr. 509].

*Watkins,* 350 F.3d at 1300. At the second step, adjudicators are instructed that "[e]ven if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be 'not inconsistent' with the other 'substantial evidence' in the individual's case record." SSR 96-2p, 1996 WL 374188, at *2. If both of these factors are satisfied with regard to a medical opinion from a treating source, "the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion." *Id.* If, on the other hand, "the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Watkins,* 350 F.3d at 1300.

Once the ALJ determines that a treating source opinion is not entitled to controlling weight, he must consider the weight he does give to such opinion "using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.'" *Id.* "Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion." *Id.* at 1300-1301. If he rejects the opinion completely, the ALJ must offer specific and legitimate reasons for so doing. *Id*; *Miller v. Chater,* 99 F.3d 972, 976 (10th Cir. 1996).

The ALJ provided the following assessment of Dr. Ahn's stated functional restrictions:

> The claimant's treating psychiatrist, Duhkeh Ahn, M.D., completed a medical source statement dated June 6, 2009. According to Dr. Ahn, the claimant's amphetamine dependence has been in full remission for a few years; but, Dr. Ahn found her mental health impairments continue. Dr. Ahn identified these include schizophrenia, paranoid type; and post traumatic stress disorder. In Dr. Ahn's opinion, the claimant has multiple functional limitations. For example, Dr. Ahn found the claimant has moderate limitation in her ability to remember and understand detailed instructions and marked limitation in her ability to carry out detailed instructions as well as in her ability to maintain attention and concentration of extended periods. Dr. Ahn also found the claimant had severe limitation in her ability to complete a normal workday and moderate limitation in her ability to get along with co-workers (Exhibit 26F). The overall medical evidence does not reflect the extent of these functional limitations. In particular, the clinic records of Dr. Ahn do not reflect the same, either. Accordingly, the findings of Dr. Ahn have been given some consideration; but, not great weight in the determination of the claimant's residual functional capacity.

[Tr. 18]. Plaintiff maintains "that this analysis was insufficient as a matter of law because it did not identify specific and legitimate reasons for rejecting Dr. Ahn's opinions, and because it failed to properly evaluate those opinions under the relevant factors." [Doc. No. 19, p. 17].[13]

Specifically, Plaintiff maintains that the ALJ's generalized assessment of Dr. Ahn's treatment notes – they failed to support functional limitations such as a marked inability to maintain attention and concentration for an extended period and a severe restriction in her ability to complete a normal workday [Tr. 18] – was insufficient as a matter of law [Doc. No.

---

[13]Plaintiff does not claim that Dr. Ahn's opinions should have been given controlling weight.

13

19, p. 17]. In this regard, it is initially noted that Plaintiff is simply wrong when she states "that Dr. Ahn saw and examined [Plaintiff] at least seven times over an approximately seven month period." *Id.* at 18. A review of the record reveals, instead, that Dr. Ahn saw Plaintiff four times[14] – on August 27, 2008 [Tr. 431 and 432-433]; on September 24, 2008 [Tr. 430]; on October 22, 2008 [Tr. 496]; and on November 11, 2008[15] [Tr. 495] – and that the treatment notes from these appointments are skeletal, at best. In that regard, Dr. Ahn states in connection with Plaintiff's August 27, 2008, mental status examination that Plaintiff says that she hears voices all the time, that she denies suicidal or homicidal thoughts, and that her insight is poor; a GAF score of 45[16] is assessed [Tr. 433].[17] The four remaining treatment

---

[14]The remaining three treatment notes attributed by Plaintiff to Dr. Ahn appear to have been completed by A. Sameer Mohammed, M.D. [Tr. 485, 489, 490, and 492]. This is consistent with Plaintiff's testimony that she began seeing Dr. Mohammad after Dr.Ahn relocated to Clinton [Tr. 30]. Dr. Ahn's medical source assessment bears her Clinton address [Tr. 509].

[15]This appears to be the last time Dr. Ahn treated Plaintiff before completing her medical source assessment some seven months later [Tr. 509 - 512].

[16]"GAF" is the abbreviation for "Global Assessment of Functioning" and is a scale utilized by clinicians to reflect overall level of functioning. *See* American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 32 4th ed., Text Revision, 2000) (DSM-IV-TR). In a multiaxial assessment system, "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning." *Id.* A GAF of 41 - 50 is reflective of "[s]erious symptoms . . . OR any serious impairment in social [or] occupational . . . functioning. (e.g., no friends, unable to keep a job)." DSM-IV-TR, at p. 34 (bold-type emphasis deleted).

[17]As Plaintiff observes in her brief, Dr. Ahn's medical source assessment – an assessment made after approximately a year of counseling [Tr. 487] – indicated that Plaintiff's GAF score had increased to 57 [Tr. 512; Doc. No. 19, p. 18, n. 8]. A GAF of 51 - 60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional

(continued...)

14

notes are check-box forms on which Dr. Ahn consistently checked, with no written comments, the same boxes: reports medication compliance, no side effects, and no suicidal/homicidal ideation; involuntary movements not observed; appropriate physical appearance; normal speech; anxious mood; constricted affect; thought oriented x 3; delusions absent; hallucinations present; cooperative; and decreased sleep [Tr. 430, 431, 495, and 496].

The ALJ clearly explained his rationale for not assigning great weight to Dr. Ahn's opinions: in part, because Dr. Ahn's clinical records do not support the work-eliminating functional restrictions[18] she assessed [Tr. 18]. And, contrary to Plaintiff's argument [Doc. No. 19, p. 18], the foregoing review of the doctor's skeletal records confirms that the ALJ's finding was legitimate; Dr. Ahn's *objective* clinical findings of an anxious mood and constricted affect plainly do not support the restrictions she imposed.

---

[17](...continued)
panic attacks) OR moderate difficulty in social, occupational, functioning (e.g., no friends, conflicts with peers or co-workers)." DSM-IV-TR, at p. 34 (bold-type emphasis deleted).

[18]The vocational expert testified as follows when asked at the administrative hearing to review Dr. Ahn's assessment:

> Marked ability to maintain attention and concentration for extended periods. Severely limited ability to complete a normal workday and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and lengths of rest periods. These are the, the two most, most critical. When we add that to a moderate limitation on the ability to carry out short and simple instructions and make simple work-related decisions, and to perform within a schedule and maintain attendance, I think that this is not a profile of an individual who is employable.

[Tr. 38].

The second factor[19] assigned by the ALJ in support of weight he accorded to Dr. Ahn's assessment was the inconsistency of her opinions with the other evidence of record [Tr. 18]. Plaintiff does not dispute the fact the ALJ thoroughly discussed this evidence in his decision but argues, instead, that the ALJ committed legal error because "he failed to discuss a significant amount of additional evidence which supported Dr. Ahn's opinions." [Doc. No. 19, p. 18]. Each of Plaintiff's specific examples is addressed in turn.

First, Plaintiff maintains that "the ALJ never mentioned Red Rock psychiatrist Dr. Mohammed's undated (but presumably written around April 2009 given its location in the record) letter noting that [Plaintiff's] auditory hallucinations had not been stabilized by medication and that [Plaintiff] had continued significant impairments in functioning and social interaction." *Id.* A review of Dr. Mohammed's letter [Tr. 485] reveals his conclusory, non-specific assessment that "[Plaintiff] continues to have significant impairment in her functioning as well as social interactions[,]" *id.,* is grounded on Plaintiff's subjective complaints of auditory hallucinations, depression, and anxiety. While it clearly would have been better practice for the ALJ to reference Dr. Mohammed's letter, in light of the ALJ's unchallenged, negative assessment of Plaintiff's credibility, the undersigned finds that the failure to discuss the undated and conclusory letter does not serve to "undermine confidence in the determination of this case." *Gay v. Sullivan,* 986 F.2d 1336, 1341, n.3 (10th Cir. 1993).

---

[19]As long as the ALJ clearly states the weight given to a treating source's opinion along with the reasons for that assessment, there is no requirement that all the factors listed in 20 C.F.R § 416.927(d) be expressly applied. *See Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007).

Next, Plaintiff points to the fact that in discussing Plaintiff's Red Rock counseling notes and Plaintiff's reported activities, the ALJ stated that "[a]t one point, the claimant reported that she had to care for her niece's three children, all under the age of four, in addition to caring for her mother[,]" [Tr. 15], while "neglect[ing] to mention that [Plaintiff] could not handle that responsibility and stopped caring for the children despite her mother's anger with her in doing so." [Doc. No. 19, p. 19]. The counseling notes at issue reflect that Plaintiff felt she was being taken advantage of by a working niece and was unable to handle the care of the niece's three children – all under the age of four – in addition to caring for her disabled mother [Tr. 448 - 449]. According to the notes, Plaintiff sat down with her mother for a discussion and they determined that the niece would need to find other child care; her mother, who wanted to see the children, was angry and had not spoken to Plaintiff for several days. Plaintiff fails to explain how the stress she reported over this family situation was supportive of Dr. Ahn's restrictive assessment. The same is true with respect to the ALJ's failure to note that at the outset of counseling at Red Rock, Plaintiff was reported as nervous, tense, and as having problems with attention [Doc. No. 19, p. 19; Tr. 465]. This simply does not support Dr. Ahn's assessment of disabling limitations.[20]

---

[20]It is worth noting that Plaintiff was also reported as having a normal range of expression; a manner and attitude appropriate to the situation; clear and consistent thoughts/expression; orientation to time, place, person, and situation; an alert rather than "distractible" learning ability [Tr. 465]; adequate memory; average intellectual ability; good social judgment; and good insight, impulse control, and readiness for change [Tr. 465 - 466].

Plaintiff further argues that the ALJ erred as a matter of law by failing to mention that the examining psychologist whose objective testing revealed that there was "a strong possibility that [Plaintiff] was malingering mental health related concerns[,]" [Tr. 373], also stated that "[t]his is fairly common given the circumstances of this evaluation and it is also possible for an individual with mental illness to also malinger mental health concerns." [Tr. 374; Doc. No. 19, p. 19]. As the Commissioner points out, however, Dr. Danaher followed the latter statement with the following: "This type of a response would be observed in one who is probably exaggerating the frequency and severity of mental health related symptoms." [Tr. 374]. Plaintiff's claim that the statement omitted by the ALJ is supportive of Dr. Ahn's limitations is unavailing.

The remaining evidence that Plaintiff maintains the ALJ erroneously failed to discuss was generated during Plaintiff's three years in prison [Doc. No. 19, pp. 19 - 20]. When Plaintiff filed her application seeking supplemental security income payments she claimed March 3, 2003, as her date of onset of disability [Tr. 84]. Evidence of Plaintiff's treatment during that time period – a period which included her three year incarceration – was included in the record. At her administrative hearing, however, Plaintiff modified her alleged date of offset, claiming that she did not become disabled until March 27, 2008, [Tr. 24], several days after her March 18, 2008, discharge [Doc. No. 19, p. 19]. Nonetheless, the evidence specifically referenced by Plaintiff – anxiety, irritability, panic attacks, low insight as to personal responsibility, nail-chewing, flat affect – does not support Dr. Ahn's disabling functional restrictions.

The ALJ stated that he declined to give great weight to Dr. Ahn's functional findings and explained that this determination was based on the fact that the "overall medical evidence" – evidence that he thoroughly detailed – did not support "the extent of these functional limitations" and on the fact that "the clinic records of Dr. Ahn do not reflect the same, either." [Tr. 18]. His reasons were both specific and legitimate. The ALJ's determination is readily susceptible to "meaningful[] review," and no legal error was committed as Plaintiff maintains. *Watkins,* 350 F.3d at 1301

**RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT**

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be affirmed. The parties are advised of their right to object to this Report and Recommendation by January 17, 2011, in accordance with 28 U.S.C. §636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 27th day of December, 2010.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE